[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 9, 2003
THOMAS K. KAHN
CLERK

No. 02-14442

D. C. Docket No. 01-00071-CV-T-17-EAJ

FOCUS ON THE FAMILY,

Plaintiff-Appellant,

versus

PINELLAS SUNCOAST TRANSIT
AUTHORITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(September 9, 2003)**

Before MARCUS and WILSON, Circuit Judges, and RESTANI[*], Judge.

MARCUS, Circuit Judge:

---

[*]Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

Focus on the Family ("Focus") appeals from the district court's order entering final summary judgment in favor of the Pinellas Suncoast Transit Authority ("PSTA"). Focus has sued the PSTA, advancing both a facial and an as-applied First Amendment challenge to a contract between PSTA and Eller Media, Inc. ("Eller") that allegedly barred Focus from advertising on bus shelters in Pinellas County, Florida its "Love Won Out" convention, a gathering that it planned to hold in the Tampa/Clearwater area during early 2000. This case requires us to resolve several jurisdictional issues concerning Article III standing, methods of proving causation and section 1983's "under color of state law" requirement. After thoroughly considering the parties' briefs and the relevant case law, we conclude that Focus has standing to advance its First Amendment claims and that appellant has demonstrated the existence of a genuine factual issue regarding the satisfaction of § 1983's state action requirement. Because the district court erred in holding contrarily, we vacate its order entering final summary judgment and remand for further proceedings consistent with this opinion.

**I**

The essential facts are these. PSTA is a governmental entity created by the State of Florida, the sole responsibility of which is the provision of public transportation within Pinellas County. In February, 1995, PSTA entered into an advertising transit shelter agreement (the "agreement" or the "contract") with Patrick Media Group ("Patrick"), pursuant to which Patrick was permitted to construct and sell advertising space on bus shelters along PSTA transit routes. In 1996, Patrick was sold to Eller, which assumed Patrick's rights and obligations under the agreement.[1] At the agreement's inception, roughly 150 PSTA-owned shelters already lined these bus routes (although these shelters do not feature advertising), and the agreement authorizes Eller to build no more than 500 additional shelters. The contract says that the structures are to be owned and managed by Eller, but the advertising revenues generated are to be shared between Eller and PSTA on a percentage basis. Moreover, Eller is required to seek PSTA's approval before constructing any shelter, and PSTA retains the right to require Eller to remove or relocate a given shelter. PSTA also specifies where on the structure advertising may appear. The agreement further provides that upon its

---

[1]Although the agreement initially bound Patrick, for the sake of convenience we will substitute Eller for Patrick in discussing the contract's terms.

expiration PSTA will have the option of purchasing the shelters for their fair market value.

Most importantly from the perspective of the instant litigation, although Eller is delegated responsibility for initially approving or disapproving proposed advertising, PSTA retains the right to review all advertisements that Eller proposes to place on the shelters and to require the removal of any advertisement that does not meet its approval.

Section V of the agreement sets forth numerous restrictions pertaining to the content of such advertising. This portion of the agreement lies at the heart of the case, and as such it is worth reproducing in its entirety. It provides:

A.   PSTA reserves the right to approve all advertising, exhibit material or announcements and the manner of their presentation, which approval shall not be unreasonably withheld.

B.   No advertising promoting the sale of alcohol, tobacco, or political or socially embarrassing subject shall be allowed in the bus shelters.

C.   No advertisement, exhibit material or announcement shall be accepted by [Eller] for display in the bus shelters which is to the knowledge of [Eller]:

1.   False, misleading or deceptive; or
2.   Clearly defamatory or likely to hold up to scorn or ridicule any person or group of persons; or
3.   Obscene or pornographic; or

4

4.   In advocacy of imminent lawlessness or unlawful violent action; or

5.   All or any combination of the foregoing.

D.   Before displaying any advertising, exhibit material or announcement which [Eller] reasonably believes may be objectionable to PSTA, [Eller] shall first submit the material to PSTA for PSTA's review. PSTA shall have the right to deny the use of any transit shelter advertising space for any material which it reasonably determines to be objectionable.

E.   Reasonable proof or clarification of statements contained in an advertisement, exhibit material or announcement may be required by PSTA as a condition of use or continued use of transit shelter advertising space.

F.   Advertisements of a political or editorial or election nature are prohibited.

G.   [Eller] shall immediately remove from any transit shelter, at [Eller's] sole cost and expense, upon written demand of PSTA or its authorized representative, any display, sign, poster or other advertising material, including advertising content, which does not meet with PSTA's reasonable approval. . . . .

Notably, the agreement does not further define any of these prohibited categories of advertising, including such terms as: "political," "socially embarrassing," "false," "misleading," "deceptive," "defamatory," "likely to hold up to scorn or ridicule any person or group of persons," "obscene," "pornographic," or "objectionable." Nor are there any other written guidelines providing any meaning for these terms. However, when a proposed advertisement

5

plainly falls within one of these categories -- e.g., a beer ad -- Eller is not required to consult PSTA before rejecting it. In other words, if an advertisement clearly is impermissible under PSTA's guidelines, then Eller may simply reject it out of hand. If the acceptability of the advertisement is a closer question, then Eller must consult PSTA, which makes the final decision whether to permit the advertisement. Plainly, under the regime PSTA has final decision-making authority regarding the approval of any advertisement.

In January, 2000, Eller's Miami office was contacted by a representative from Focus on the Family, an evangelical organization dedicated to the preservation of what it believes to be the appropriate American family structure. Among Focus's organizational convictions is that homosexuality is a preventable condition. Consistent with this view, in early 2000 Focus held a conference in the Tampa/Clearwater area that it denominated "Love Won Out." Appellant wished to publicize the conference through advertising, and its call to Eller was a product of this desire. Specifically, Focus wanted to place on several bus shelters in Pinellas County advertisements featuring a close-up picture of a human face, with the words "Love Won Out: Addressing, Understanding and Preventing Homosexuality in Youth" printed over the image.

6

Focus alleges that Becky Blair, its employee in charge of advertising for the conference, faxed a copy of the advertisement to Norma Berger, an Eller representative, and that Eller approved it. PSTA concedes that Eller sent Focus its standard contract and that appellant signed this document, although no Eller representative ever signed it. Blair subsequently sent the artwork for the poster to a printing company. After the advertisements were completed, Focus asserts, Berger contacted Blair and informed her that the Love Won Out advertisements had been rejected because the "Tampa Transit Authority" did not like the word "homosexuality." Some time later, appellant continues, Karen Eaglin, the director of the conference, contacted Frank Bitetto, another Eller representative. Bitetto similarly told Eaglin that the advertisements had been rejected by PSTA because it was overly political. Focus alleges that Eaglin asked to speak with Bitetto's supervisor, Shawn Ulrich, who informed her that Bitetto (and, by implication, Berger) was mistaken, and that it was Eller that rejected the advertisements.

PSTA says that it was Wayne Mock, the General Manager of Eller's Clearwater Office,[2] who decided not to run the Love Won Out advertisements. Appellee says that Ulrich and Bitetto presented the advertisements to Mock

_____

[2]This is the title that PSTA says Mock possessed. Focus refers to him as the President of Eller's Florida region.

7

because they were concerned with their content, and that Mock decided not to approve it because the notion that homosexuality is preventable is highly controversial and potentially offensive. Mock said during his deposition that although he believed that appellant's advertisements were prohibited under the PSTA-Eller contract, his decision was not based on that agreement but instead was predicated entirely on Eller's internal policies and its standard contract (which, to reiterate, Focus signed but Eller did not). This account was corroborated by Roger Sweeney, PSTA's Executive Director, who testified that PSTA was not involved in the decision to reject Focus's advertisements. Following the rejection of the Love Won Out advertisements, Eller returned Focus's payment for the ads and the copies of the advertisements themselves.

Based on this pattern of dealing, Focus first brought suit against Eller and PSTA in the state Circuit Court for the Sixth Judicial Circuit, in Pinellas County, under Florida's Public Records Law. Specifically, Focus sought to compel the disclosure of records relating to Eller's management of its advertising space on PSTA's shelters. Although the Public Records Law is inapplicable to private entities, appellant argued that documents in Eller's possession pertaining to the sale of advertisements on the shelters were subject to disclosure because under the agreement Eller and the state (through PSTA), were parties to a symbiotic

8

relationship. In other words, Focus argued that Eller possessed sufficient characteristics of a state actor to bring it within the ambit of the Public Records Law. The state circuit court rejected this argument, holding that Eller and PSTA were legally autonomous entities and that Eller was not covered by the Florida law. See Focus on the Family, Inc. v. Eller Media Co., No. 00-001419CI-19 (Fla. Cir. Ct. Apr. 6, 2000) (order denying amended emergency petition to compel the disclosure of public records). The Second District Court of Appeal affirmed. See Focus on the Family, Inc. v. Eller Media Co., No. 2D00-1979 (Fla. 2nd Dist. Ct. App. Apr. 6, 2001) .

Subsequently, on January 11, 2001, Focus filed this action against PSTA pursuant to 42 U.S.C. § 1983 in the United States District Court for the Middle District of Florida. It alleged that the rejection of its Love Won Out advertisements violated the First Amendment's free speech guaranty. Specifically, Focus challenged the PSTA-Eller contract both on its face and as applied to its advertisements. It sought (1) a declaration that the agreement was unconstitutional; (2) an injunction against the continued enforcement of the agreement; and (3) an injunction requiring PSTA to run its Love Won Out advertisements. After discovery had proceeded, the parties filed cross-motions for summary judgment. Focus sought summary judgment on its facial challenge

only,[3] while PSTA sought summary judgment on both of appellant's challenges to the agreement.

Although the district court denied Focus's motion, on August 2, 2002 it granted final summary judgment in favor of PSTA. It held that § 1983's state action requirement was unsatisfied, as it was Eller and not PSTA that rejected appellant's advertisements. The district court also held that Focus lacked Article III standing to challenge the PSTA-Eller contract because it had suffered no harm as a result of that agreement. Nor, the district court found, did Focus establish a likelihood of future harm as a result of the agreement. Since it found that Focus had not advanced a viable § 1983 claim, the district court never addressed the merits of appellant's First Amendment arguments. This appeal ensued.

## II

On appeal, Focus argues that PSTA's execution of the agreement with Eller is itself state action, and that the agreement consequently can be challenged pursuant to § 1983. Focus further contends that Section V of the agreement is facially unconstitutional because it is a viewpoint-based restriction on speech and

---

[3]Focus opted not to seek summary judgment on its as-applied challenge because it believed that genuine factual issues remained concerning whether the agreement was responsible for its harm.

because it is a vague and overbroad prior restraint. Finally, appellant argues that there remain disputed issues of material fact concerning whether PSTA was involved in the rejection of its advertisements. Focus argues that these questions bear on the merits of its as-applied challenge, and that as such the district court's entry of summary judgment as to this claim was inappropriate. It asserts, however, that the existence of these disputed factual issues does not preclude the entry of summary judgment in its favor on the facial challenge.

PSTA responds by defending the district court's state action and standing determinations. It further argues that the court's entry of summary judgment should be affirmed because Focus's alleged constitutional deprivation was not caused by a PSTA policy or custom, and as such no viable § 1983 claim lies in this case. In addition, it says that even if we reach the merits of appellant's First Amendment claim, that claim is without merit because the bus shelters are non-public fora -- indeed, are private property. Finally, it argues that because Focus failed to join Eller as an indispensable party under Fed. R. Civ. P. 19, the action must be dismissed anyway.

We review de novo a summary judgment ruling, applying the same legal standard used by the district court. See Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1242-43 (11th Cir. 2001). In conducting this examination, we view

11

the materials presented and all factual inferences in the light most favorable to the non-moving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed.2d 142 (1970). Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of demonstrating the satisfaction of this standard lies with the movant, who must present "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" that establish the absence of any genuine, material factual dispute. Id.

A.    Article III Standing

Although the district court analyzed standing after it discussed the state action requirement, we address it at the outset of our analysis because it directly implicates federal subject matter jurisdiction. See National Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242 (11th Cir. 2003) ("[B]ecause the constitutional standing doctrine stems directly from Article III's 'case or controversy' requirement . . . , this issue implicates our subject matter jurisdiction, and accordingly must be addressed as a threshold matter." (citing Vermont Agency

of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771, 120 S. Ct.

1858, 1861-62, 146 L. Ed. 2d 836 (2000) and

Juidice v. Vail, 430 U.S. 327, 331, 97 S. Ct. 1211, 1215, 51 L. Ed. 2d 376

(1977)));

see also Florida Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab.

Servs., 225 F.3d 1208, 1227 n.14 (11th Cir. 2000) ("[M]ootness -- like standing . . .

-- raises . . . [a] basic question of jurisdiction that cannot be waived and goes to the

very heart of the 'case or controversy' requirement of Article III.  At least in this

context, therefore, questions of mootness ought to be resolved first.") (emphasis

added).

     To borrow from our discussion in National Parks Conservation Ass'n:

> In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61,
> 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992), the
> Supreme Court set forth the test for Article III standing.
> First, the plaintiff must have suffered an "injury in fact,"
> or "an invasion of a legally protected interest which is . .
> . concrete and particularized." Id. at 560, 112 S. Ct. at
> 2136.  Second, the plaintiff must demonstrate the
> existence of a causal connection between the injury and
> the conduct complained of, see id., and finally, it is
> necessary to establish that it is "'likely,' as opposed to
> merely 'speculative,' that the injury will be 'redressed by
> a favorable decision.'" Id. at 561, 112 S. Ct. at 2136
> (quoting Simon v. Eastern Ky. Welfare Rights Org., 426
> U.S. 26, 41-42, 96 S. Ct. 1917, 1926, 48 L. Ed. 2d 450
> (1976)).  Furthermore, where a plaintiff seeks

13

prospective injunctive relief, it must demonstrate a "real and immediate threat" of future injury in order to satisfy the "injury in fact" requirement. City of Los Angeles v. Lyons, 461 U.S. 95, 103-04, 103 S. Ct. 1660, 1665-66, 75 L. Ed. 2d 675 (1983); Wooden v. Bd. of Regents, 247 F.3d 1262, 1283-84 (11th Cir. 2001).

324 F.3d at 1241.

In this case, the district court said that both the injury in fact and causation (or "traceability") requirements were unfulfilled. It also determined that the "likelihood of future injury" requirement set forth in Lyons, 461 U.S. at 111, 103 S. Ct. at 1670, was unsatisfied. In reality, however, the court's analysis of each of these factors was concerned with the perceived lack of a causal connection between the PSTA-Eller agreement and the rejection of the Love Won Out advertisements.

Preliminarily, we believe the district court erred to the extent it concluded that Focus had not suffered a concrete, particularized injury in fact. The district court's determination that the "injury in fact" requirement was unsatisfied because Focus "failed to present any evidence that it was injured as a result of the agreement" plainly conflates the first and second prongs of Lujan. Moreover, it implicitly recognizes, as it must, that Focus was in fact harmed. Simply stated, it is undisputed that appellant was unable to advertise its conference, and it

14

expended time, energy and money in producing advertisements following Eller's initial approval of the advertisements that ultimately went unused. Moreover, it seems likely that appellant's conference was less well attended than it would have been had it been able to promote the gathering on Eller's bus shelters. The first prong of Lujan is easily satisfied.

As for Lujan's second prong -- the requirement of a causal connection between the injury and the conduct complained of -- the district court held simply that "[h]ere, Eller denied Plaintiff's advertisement[s], not [PSTA]. [Focus] has presented no evidence that, had [PSTA] been given the opportunity, it would have denied the agreement based on the terms of the agreement." Importantly, in evaluating Article III's causation (or "traceability") requirement, we are concerned with something less than the concept of "proximate cause." See Loggerhead Turtle v. City Council, 148 F.3d 1231, 1251 n.23 (11th Cir. 1998). As we noted in Loggerhead Turtle, "no authority even remotely suggests that proximate causation applies to the doctrine of standing." Id. Instead, even harms that flow indirectly from the action in question can be said to be "fairly traceable" to that action for standing purposes. See id. at 1250-51; Vermont Agency of Natural Res., 529 U.S. at 771, 120 S. Ct. at 1861 ("[To prove standing a plaintiff] must establish causation -- a 'fairly ... trace [able]' connection between the alleged injury in fact

and the alleged conduct of the defendant." (quoting <u>Simon</u>, 426 U.S. at 41, 96 S. Ct. at 1926)); <u>The Pitt News v. Fisher</u>, 215 F.3d 354, 357 (3d Cir. 2000).

We disagree with the district court's conclusion that Article III's causation requirement was unsatisfied in this case. In reaching this determination, we note again that <u>for standing purposes</u> Focus is not required to prove causation beyond a reasonable doubt or by clear and convincing evidence. Instead, the existence of record evidence of PSTA's direct involvement in the rejection of appellant's advertisements is sufficient to satisfy Article III's causation prong. As the Supreme Court has observed:

> The essence of the standing question, in its constitutional dimension, is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' (as) to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." The plaintiff must show that he himself is injured by the challenged action of the defendant. <u>The injury may be indirect</u>, but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions.

<u>Village of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 260-61, 97 S. Ct. 555, 561, 50 L. Ed. 2d 450 (1977) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498-99, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975) and citing <u>United</u>

16

States v. SCRAP, 412 U.S. 669, 688, 93 S. Ct. 2405, 2416, 37 L. Ed. 2d 254 (1973)) (other citations omitted) (emphasis added).

To this end, Eaglin testified that Bitetto explicitly told her that the Love Won Out advertisements had been rejected because the "Tampa Transit Authority" did not like the word "homosexuality." Likewise, Blair testified that Berger told her that the advertisements had been rejected because the "'Tampa Transit Authority" objected to the word 'homosexuality.'" Furthermore, Mock, an Eller General Manager, expressly testified that the Love Won Out advertisements were prohibited under the PSTA-Eller agreement because they were, in his estimation, defamatory and likely to hold homosexuals up to scorn or ridicule. However, he suggested that the advertisements were not rejected based on this contract, but instead on Eller's own prohibition against potentially offensive and misleading advertising. Similarly, Sweeney, PSTA's Executive Director, opined that the Love Won Out advertisements could be considered socially embarrassing, false, misleading or deceptive, and conceded that such ads were specifically prohibited under the agreement.

Thus, not only is there direct evidence that the advertisements were rejected based on Section V of the PSTA-Eller agreement, but furthermore the uncontroverted testimony in this case is that Focus's advertisements were rejected

17

for having characteristics of exactly the type that the PSTA-Eller contract expressly deemed unacceptable. This testimony undermines the district court's suggestion that Focus presented no evidence that the advertisements would have been denied pursuant to the contract, and is more than sufficient to establish a fairly traceable connection between the injury-in-fact alleged by Focus and appellees' alleged conduct.

This is especially so given that the injury-in-fact and, as we explain below, redressibility prongs of the standing inquiry plainly are satisfied. In short, Focus has presented evidence establishing, for standing purposes, a causal connection between the PSTA-Eller agreement and the rejection of its Love Won Out advertisements. This evidence includes a showing that (1) more than one Eller employee expressly said that the "Tampa Transit Authority" had rejected the advertisements; and (2) the ads were rejected on the same grounds -- namely, political controversialism, offensiveness and the potential to subject a discernible social group to ridicule -- that are expressly designated in the agreement as unacceptable.

The third component of the standing inquiry -- redressibility -- is in this case established in exactly the same manner as the causation requirement is satisfied. If the PSTA-Eller agreement caused Focus to sustain concrete injury -- that is, if the

18

decision to reject the Love Won Out advertisements was based on Section V of that contract (and for standing purposes the evidence is sufficient on this point) -- then that injury can be redressed by an injunction prohibiting the enforcement of that agreement. The redressibility requirement also is satisfied here.

Finally, the district court also appears to have held -- and this point is closely tied to its conclusions regarding the lack of a causal relationship between the PSTA-Eller agreement and the rejection of appellant's proposed advertisements -- that Focus was unable to establish its Article III standing to seek prospective injunctive or declaratory relief. The Supreme Court has held that where a plaintiff seeks these types of prospective relief, it must demonstrate a "real and immediate threat" of future injury to satisfy the "injury in fact" requirement. Lyons, 461 U.S. at 103, 103 S. Ct. at 1666; see also id. at 102, 103 S. Ct. at 1665 ("'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.'" (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S. Ct. 669, 675-76, 38 L. Ed. 2d 674 (1974))); Johnson v. Bd. of Regents, 263 F.3d 1234, 1265 (11th Cir. 2001) ("[T]o have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.") (citations omitted);

Wooden v. Bd. of Regents, 247 F.3d 1262, 1284 (11th Cir. 2001) ("Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate -- as opposed to a merely conjectural or hypothetical -- threat of future injury."). This is so because "[l]ogically, 'a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past.'" Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994) (quoting American Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992)).

Lyons does not pose a bar to Focus's standing to sue for prospective injunctive or declaratory relief. Importantly, in reaching this determination, we note that Article III standing must be determined as of the time at which the plaintiff's complaint is filed. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610 (2000) ("[W]e have an obligation to assure ourselves that FOE had Article III standing at the outset of the litigation."); Cleveland Branch, NAACP v. City of Parma, 263 F.3d 513, 524 (6th Cir. 2001) ("[S]tanding does not have to be maintained throughout all stages of litigation. Instead, it is to be determined as of the time the complaint is filed."); Becker v. Fed. Election Comm'n, 230 F.3d 381, 386 n.3 (1st Cir. 2000) (noting that Lujan "clearly indicat[es] that standing is to be

20

'assessed under the facts existing when the complaint is filed'") [(citations omitted)]; White v. Lee, 227 F.3d 1214, 1243 (9th Cir. 2000) ("Standing is examined at 'the commencement of the litigation.'"); Park v. Forest Serv. of the United States, 205 F.3d 1034, 1037 (8th Cir. 2000) ("We do not think, however, that the actual use of checkpoints in 1997, 1998, and 1999 is relevant on the issue of standing because all of these events occurred after [the plaintiff] filed her original complaint."); Perry v. Vill. of Arlington Heights, 186 F.3d 826, 830 (7th Cir. 1999) ("Because standing goes to the jurisdiction of a federal court to hear a particular case, it must exist at the commencement of the suit."); Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction.").

In its original complaint, filed on January 11, 2001, Focus explicitly said that it would hold another Love Won Out conference, prospectively, on a date certain (November 10, 2001), and that it would seek to advertise this seminar on PSTA shelters. Although Focus filed an amended complaint on July 10, 2002 -- and thus it is necessary that appellant possessed Article III standing on this later date, see County of Riverside v. McLaughlin, 500 U.S. 44, 51, 111 S. Ct. 1661,

1667, 114 L. Ed. 2d 49 (1991) (undertaking the <u>Lyons</u> standing inquiry as of "the time the second amended complaint was filed") -- this pleading featured the identical allegations regarding appellant's plans to hold another Love Won Out conference on November 10, 2001 and to advertise this seminar on PSTA shelters. Under Fed. R. Civ. P. 15(c)(2), these allegations plainly relate back to January 11, 2001, the date on which appellant's original complaint was filed. <u>See</u> <u>Mederos v. United States</u>, 218 F.3d 1252, 1254 (11th Cir. 2000) ("Mederos's second motion satisfied the requirements to relate back to his initial motion under Fed.R.Civ.P. 15(c)(2), <u>as the second motion stated identical allegations as his initial motion</u>." (citing Fed. R. Civ. P. 15(c)(2) and <u>United States v. Duffus</u>, 174 F.3d 333, 337 (3d Cir. 1999) and <u>United States v. Craycraft</u>, 167 F.3d 451, 457 (8th Cir. 1999))) (emphasis added).

Having demonstrated injury-in-fact, causation and redressibility, and having made the showing required by <u>Lyons</u>, Focus has established Article III standing to raise a claim concerning the constitutionality of Section V of the agreement and the rejection of its advertisements pursuant to that section. Today we decide no more and no less. Our decision that appellant has standing says nothing more than that Focus is entitled to be heard in a federal court on its First Amendment claims. It does not mean that appellant will likely prevail on those claims.

22

B.    State Action[4]

Focus also denotes as error the district court's conclusion that final summary judgment was appropriate based on appellant's failure to show that 42 U.S.C. § 1983's state action requirement was satisfied in this case. After carefully considering the parties' arguments as to this point and reviewing the record evidence, we hold that Focus has demonstrated the existence of a genuine factual issue as to whether state action is presented here. See generally Goldstein v. Chestnut Ridge Volunteer Fire Co., 25 F.3d 1039 (4th Cir. 1999) (table disposition) (holding that the state action determination turned on unresolved factual questions, and that summary judgment consequently was inappropriate); Gibson v. City of Chicago, 910 F.2d 1510, 1517 (1990) ("[T]he essential inquiry [at the summary judgment stage] becomes whether [the plaintiff] has created a triable issue of fact concerning whether [the officer's] actions related in some way to the performance of a police duty."); Layne v. Sampley, 627 F.2d 12, 13 (6th Cir. 1980) ("Although in certain cases, it is possible to determine the question whether a person acted

---

[4]Although § 1983 technically requires that the action in question be taken "under color of [state] law," this requirement is considered in pari materia with the Fourteenth Amendment's state action requirement. See Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S. Ct. 2764, 2269-70, 73 L. Ed. 2d 418 (1982) ("In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." (quoting United States v. Price, 383 U.S. 787, 794 n.7, 86 S. Ct. 1152, 1157 n.7, 16 L. Ed. 2d 267 (1966))). For simplicity's sake, we refer to this as § 1983's "state action" requirement.

23

under color of state law as a matter of law, there may remain in some instances 'unanswered questions of fact regarding the proper characterization of the actions' for the jury to decide." (quoting Rowe v. Tennessee, 609 F.2d 259, 265 (6th Cir. 1979))) (other citations omitted).  Accordingly, the district court erred by entering final summary judgment in favor of PSTA on this issue.

Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

As the Supreme Court has explained, "[t]o state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.  Like the state-action

24

requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999) (internal punctuation and citations omitted). Section 1983's state action requirement applies regardless of the nature of the substantive deprivation being alleged. Thus, Focus may advance neither its facial nor its as-applied challenge if the rejection of its advertisements is not attributable to PSTA.

We have employed three distinct tests in determining whether the actions of a private entity are properly attributed to the state. In Willis v. Univ. Health Servs., Inc., we summarized the distinctions between these tests as follows:

> Previously, this circuit set forth the three primary tests the Supreme Court has used to determine whether state action exists: (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test. The public function test limits state action to instances where private actors are performing functions "traditionally the exclusive prerogative of the state." The state compulsion test limits state action to instances where the government "has coerced or at least significantly encouraged the action alleged to violate the Constitution." The nexus/joint action test applies where "the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." We must determine on a case-by-case basis whether sufficient state action is present from a non-state actor (defendant) to sustain a section 1983 claim.

25

993 F.2d 837, 840 (11ᵗʰ Cir. 1993) (quoting National Broad. Co., Inc. ("NBC") v. Communications Workers of Am., AFL-CIO, 860 F.2d 1022, 1026-27 (11ᵗʰ Cir. 1988)) (other citations omitted).

In Blum v. Yaretsky, 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982), a case featuring facts similar to those now at bar, the Supreme Court applied a standard analogous to our nexus/joint action test. In Blum, the plaintiffs brought a § 1983 action challenging decisions by several private nursing homes to transfer or discharge Medicaid patients. However, the defendants in the case were not the nursing homes or any agent thereof, but instead were "state officials responsible for administering the Medicaid program [and regulating nursing homes] in New York." Id. at 1003, 102 S. Ct. at 2785. In other words, the Court summarized, the lawsuit sought "to hold state officials liable for the actions of private parties . . . ." Id.

In outlining a mode for determining the propriety of holding the state liable for private conduct, the Court said: "the complaining party must . . . show that 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" Id. (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351, 95 S. Ct. 449, 453, 42 L. Ed. 2d 477 (1974)). It continued: "The purpose of this

26

requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains. The importance of this assurance is evident when, as in this case, the complaining party seeks to hold the State liable for the actions of private parties." Id. The Court further held that "although the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." Id. at 1004-05, 102 S. Ct. at 2786 (citations omitted) (emphasis added).

Consistent with the standard outlined in Blum, under the nexus/joint action test, we ask "whether 'the [s]tate has so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise.' 'To charge a private party with [s]tate action under this standard, the governmental body and private party must be intertwined in a symbiotic relationship.' The Supreme Court has indicated that the symbiotic relationship must involve the 'specific conduct of which the plaintiff complains.'" Rayburn ex

27

rel. Rayburn v. Hogue, 241 F.3d 1341, 1348 (11th Cir. 2001) (quoting NBC, 860 F.2d at 1026-27 and Sullivan, 526 U.S. at 51, 119 S. Ct. at 985) (other citations and internal punctuation omitted).

In this case, PSTA established explicit rules for determining the acceptability of an advertisement and, under its agreement with Eller, retains final decision-making authority over the acceptability of all proposed advertisements. Moreover, Focus has introduced both direct (though contested) evidence that PSTA rejected the Love Won Out advertisements, and uncontested evidence that its advertisements were rejected on bases expressly designated by PSTA as unacceptable. As such, appellant has presented ample objective evidence on which a reasonable factfinder could conclude that PSTA is responsible for the rejection of its advertisements. In a relatively similar context, we rejected a nexus/joint action argument based primarily on the fact that "[t]here [was] no evidence . . . that [the state] had anything to do with [the private entity's] decision to deny [the plaintiff's] application; rather, the Agreement gave sole authority regarding such decisions to [the private entity]." Patrick v. Floyd Med. Ctr., 201 F.3d 1313, 1316 (11th Cir. 2000). This case presents the precise inverse of that situation, and accordingly the legal outcome also diverges from the one reached in Patrick. In short, there is palpable evidence that this is not a case where a private

28

actor in a contractual relationship with a governmental entity acted independently in harming a third party, but rather that the state, acting through the private entity, caused the third party's harm.

The district court rejected the nexus/joint action test as a basis for finding state action in this case because "actions of private parties under contract with state agencies do not provide a sufficient nexus for state action." This proposition, of course, is true as far as it goes; the mere fact that a private actor contracts with a governmental entity does not mean that every action taken by the private actor can be attributed to the government. However, in cases (like this one) where the state contractually requires the private actor to take particular actions -- e.g., to reject proposed advertisements under certain specifically delineated circumstances -- then it can be said at the summary judgment stage that in acting in accordance with the governmental directive the private actor is merely a surrogate for the state, and the tie between them is sufficiently strong for the nexus/joint action test to be satisfied. This conclusion is strengthened when there is record evidence that the state itself unmistakably directed the private actor to take particular actions. Cf. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 297-98, 121 S. Ct. 924, 931, 148 L. Ed. 2d 807 (2001) (discussing the Tarkanian case, and saying that "[s]ince it was difficult to see the NCAA, not as a collective

29

membership, but as surrogate for the one State, we held the organization's connection with Nevada too insubstantial to ground a state-action claim" (citing <u>Tarkanian</u>, 488 U.S. at 193, 196, 109 S. Ct. at 462-64)).

On the record before this court, we are satisfied Focus has presented sufficient evidence that, if credited, would satisfy § 1983's state action requirement under the nexus/joint action test. This evidence fairly creates a triable issue of material fact and precludes the entry of final summary judgment against appellant. The district court erred in concluding otherwise.

### C. PSTA's Rule 19[5] Argument

---

[5]This Rule provides:

> (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper,

30

PSTA also argues that because Focus failed to join Eller as an indispensable party under Fed. R. Civ. P. 19, the action must be dismissed. The district court never evaluated this contention, having concluded that summary judgment against Focus was appropriate on standing and state action grounds.

As we have explained:

> Rule 19 states a two-part test for determining whether a party is indispensable. First, the court must ascertain under the standards of Rule 19(a) whether the person in
>
> that party shall be dismissed from the action.
>
> (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
>
> (c) Pleading Reasons for Nonjoinder. A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as prescribed in subdivision (a)(1)-(2) hereof who are not joined, and the reasons why they are not joined.
>
> (d) Exception of Class Actions. This rule is subject to the provisions of Rule 23.

Fed. R. Civ. P. 19.

question is one who should be joined if feasible. If the person should be joined but cannot be (because, for example, joinder would divest the court of jurisdiction) then the court must inquire whether, applying the factors enumerated in Rule 19(b), the litigation may continue.

Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc., 669 F.2d 667, 669 (11th Cir. 1982). In making the first determination -- i.e., whether the party in question "should be joined," "pragmatic concerns, especially the effect on the parties and the litigation,' control." Id. (quoting Smith v. State Farm Fire & Cas. Co., 633 F.2d 401, 405 (5th Cir. 1980); see also In re Torcise, 116 F.3d 860, 865 (11th Cir. 1997) ("[F]indings of indispensability must be based on stated pragmatic considerations, especially the effect on parties and on litigation.").

In this case, PSTA argues that Eller is an indispensable party, and that Focus's failure to join Eller warranted the district court's entry of final summary judgment in its favor. Specifically, PSTA argues that because it has no power to affirmatively require Eller to run a particular advertisement on its bus shelters, Focus cannot possibly benefit from an injunction requiring the placement of its advertisements on the shelters unless Eller is made a party to this action. Focus argues in response that the primary relief it seeks is the invalidation of the PSTA-Eller agreement, and that Eller need not be joined in order to accomplish this.

Although Focus's argument is correct as far as it goes, we agree with PSTA that <u>complete</u> relief cannot be afforded in Eller's absence, as PSTA cannot require the running of a particular advertisement on its bus shelters. Accordingly, under Fed. R. Civ. P. 19(a) Eller should be joined in this action, if feasible. However, PSTA has identified no reason why Eller cannot be joined in this action. For example, we need not worry about the destruction of complete diversity, as there is federal question jurisdiction over this action. <u>See</u> 28 U.S.C. § 1331. Moreover, it appears plain that Eller is subject to personal jurisdiction in the Middle District of Florida.

Accordingly, we need not resolve the question of whether Eller is indispensable or merely necessary under Rule 19(b). <u>See California v. Arizona</u>, 440 U.S. 59, 62 n.3, 99 S. Ct. 919, 922 n.3, 59 L. Ed. 2d 144 (1979) ("[W]hen a person described by Rule 19(a) <u>cannot be joined</u>, 'the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.'" (quoting Fed. R. Civ. P. 19(b)) (emphasis added); <u>Bassett v. Mashantucket Pequot Tribe</u>, 204 F.3d 343, 358 (2d Cir. 2000) (recognizing that dismissal for failure to join an indispensable party is appropriate only where the entity in question "'cannot be made a party'" (quoting Fed. R. Civ. P. 19(b)).

33

Because it appears that Eller readily can be made a party to this action, the standard for dismissal under Rule 19(b) is unmet. Instead, on remand Focus need only join Eller as a party defendant in this action. See Fed. R. Civ. P. 19(a) ("If the [party to be joined if feasible] has not been . . . joined, the court shall order that the person be made a party.").

For the foregoing reasons, the district court erred insofar as it concluded that Focus lacks Article III standing to advance its claims. The court also erred by entering final summary judgment for PSTA on the ground that § 1983's "under color of state law" (state action) requirement is unsatisfied, as this remains a triable factual issue. Because we have directed Focus to join Eller in this action, and its claims for injunctive relief consequently will remain justiciable, each of appellant's First Amendment claims should be addressed on their merits. This is a task that we leave in the first instance to the district court on remand.

Accordingly, we vacate the district court's order entering final summary judgment in favor of PSTA and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**